IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANGELA EKHATO                    :        CIVIL ACTION
                                 :
        v.                       :
                                 :
RITE AID CORPORATION, et al.     :        NO. 10-CV-2564

## MEMORANDUM AND ORDER

Ditter, J.                                              August 23, 2012

        This is an employment discrimination case brought against the Rite Aid Corporation, Rite

Aid of Pennsylvania, Inc., and John Boyle, Regional Vice President of Pharmacy Operations.

Plaintiff, Angela Ekhato, alleges that she was subjected to race, national origin, age and

retaliatory discrimination that led to the termination of her employment as a Pharmacy District

Manager ("PDM").  Presently before me is the defendants' motion for summary judgment which

I am granting.[1]

## I.  FACTUAL BACKGROUND[2]

        Ekhato describes herself as a black woman who was born in Nigeria and is a naturalized

citizen of the United States.  She began working for Rite Aid as a pharmacist in June 2005.[3]

Ekhato performed well as a pharmacist and was assigned some special projects.  Her direct

---

[1] Oral argument was heard on June 21, 2012.

[2] Where facts are agreed, I have not cited the record; however, if uncontested but not stipulated, I have included a citation to the record.  I recount the facts in some detail because in many ways this case has developed differently than when I considered the defendants' motion to dismiss.

[3] Ekhato was an "at will" employee and understood that her employment could be terminated at any time, with or without advance notice and with or without cause.  *Plt's Ans.,* Exh. B, *Ekhato Dep.* at 86-87.

supervisor was PDM Alexander Kocsy.

In November or December 2007, Ekhato learned through an internal Rite Aid listing that a PDM position was open.  Kocsy supported Ekhato's decision to apply for this position and recommended her for the job.  Ekhato was first interviewed for this position by Boyle.  *See Plt.'s Ans. to Summ. Judg. Mot ("Plt.'s Ans."),* Exh. B, *Ekhato Dep.* at 104.  During a second interview with Boyle, he told Ekhato that he wanted to promote her, but before a final decision was made, she would have to be interviewed by Rite Aid executives Phil Keogh, a Regional Pharmacy Vice President and Boyle's supervisor; Jon Olsen, a Senior Vice President; and Brian Fiala, an Executive Vice President, at the Rite Aid offices in Harrisburg.  *Id.* at 107-08.  He also told her to be prepared for questions about her management experience because she was not a pharmacy manager at Rite Aid.  *Id.*  As expected, Olsen asked Ekhato about her lack of management experience at Rite Aid.  *Id.* at 114.  When Keogh expressed concerns about her lack of management experience, Ekhato described pre-Rite Aid work experience that she believed resulted in transferrable management skills.  *Id.* at 119-120.

Ekhato was promoted to the position of PDM for District 7203 on December 23, 2007.  *Plt.'s Ans.,* Exh. 42.  She was 50 years old at that time.  Boyle, a 52 year-old, white male who was born in the United States, became her direct supervisor.  Boyle asked two experienced PDMs, Hao Tran and Cynthia Chang, to assist Ekhato in her transition to management.[4]

After her promotion, Ekhato toured the pharmacies in her district.  On February 14, 2008, Ekhato provided Boyle with a document she entitled an "executive summary" that listed the

---

[4] These mentoring relationships eventually soured, in part, because Ekhato tried to hire pharmacists away from her mentors' districts.

problems she found in four of her stores.[5]  *See Compl.* Exh.1.  These problems included staffing

issues for pharmacists and technicians, paperwork backlogs, and customer complaints.  She

attributed the problems, in part, to the lack of consistent management in prior years.  She

provided this summary to Boyle for his input and in an effort to obtain additional personnel for

the pharmacies.[6]  Ekhato maintains that Boyle did not respond to her report.  *Plt's Ans.* at 15

("Mr. Boyle did not respond to Dr. Ekhato's February 14, 2008 memo.  He simply ignored it.  To

try to fill the pharmacist vacancies, Dr. Ekhato contacted Patricia Sims, a Rite Aid employee

based in Maryland responsible for recruiting pharmacists.").  In contrast, Ekhato stated in her

complaint that Boyle instructed her to contact Sims concerning her staffing needs.  *Compl.* ¶ 62.[7]

In any event, Ekhato exchanged e-mails with Sims on February 27, 2008, only two weeks after

she gave her report to Boyle, and they arranged to meet on March 6, 2008.  *Plt's Ans.,* Exh.18.

Boyle's alleged lack of response to Ekhato's request for additional personnel caused

problems in their working relationship over the next few months.  Ekhato testified that she would

try to speak to Boyle about her ideas and her perceived staffing needs, but he would only yell at

her that she had all the pharmacists she needed.  When the arguments continued and Ekhato was

---

[5] In March 2008, Rite Aid changed the composition of the districts in this region.  Ekhato's District 7203 became District 7013 and included 19 pharmacies.  Ekhato views this change as further evidence of Boyle's discriminatory animus, but Rite Aid representatives have testified that the changes were made at the corporate level and without any input from Boyle and she has offered no evidence to refute this assertion.

[6] It is the responsibility of the PDM to properly staff the pharmacies in her district within the constraints of the payroll budget.

[7] At her deposition, Ekhato testified Boyle's secretary, not Boyle, told her to contact Sims but she concedes that the secretary would have been acting on the instructions of Boyle.  *Plt's Ans.,* Exh. B, *Ekhato Dep.* at 189-90.  Thus, she has alleged at different times that there was no response, there was a response from Boyle, and there was a response from Boyle's secretary.  Of course, while this hop, skip, and a jump shows versatility, it is of no real import because it is undisputed that Ekhato contacted Sims for the assistance she needed and within the next few months her staffing problems were solved.  *Id.* at 248; *Plt.'s Ans.,* Exh. 18.

unable to get the additional personnel she desired, she sought advice from two co-workers.  One

of those co-workers, human resources manager Mark Firment suggested she contact Kandy

Grenier in Rite Aid's Human Resource Department and she did.  *Plt's Ans.,* Exh. B, *Ekhato Dep.*

at 232.

Following a May 21, 2008 meeting with Grenier,[8] Ekhato e-mailed Grenier a letter

summarizing the complaints she raised at the meeting.  *Compl.* Exh. 2.  Ekhato detailed her

efforts to get a response from Boyle concerning her executive summary and his advice to contact

recruiter Patricia Sims for assistance with staffing issues.  She described his reaction to her

staffing request as follows:

> John called me when he received this sysm[9] and basically "chewed
> me out."  He yelled and yelled, telling me that I will walk myself
> out of my job if I think that I need all the pharmacists I had listed
> and hung up on me when he was done yelling.  He called me back
> after about 5 mins[.], and started yelling at me again, and he would
> not let me say anything.  I kept saying John, John, John, please let
> me explain, but he hung up on me without giving me the
> opportunity to explain.  I am sure everyone in the pharmacy knew
> what had happened and it was humiliating.  I tried to cover it up
> but I don't think I was successful at it because the pharmacist
> asked me if I was alright.  John called me in the afternoon to
> apologize for his outburst.  The only two statements I made were
> that I expected him to discuss this in a professional manner, and
> that I did not deserve to be yelled at considering the condition of
> my district and all I have been doing to clean it up.  I thought this
> incident would be the first and last of such an outburst.  Rather, it
> intensified; his telephone calls would not just stop from morning
> till [sic] evening, most of the time it is to yell at and hang up on me
> when he was done yelling.  I am not used to this.

*Id.* at 1.  This correspondence goes on to describe four similar incidents culminating in a call on

---

[8] Grenier recalls this meeting occurred on May 20, 2008.

[9] *Sysm* is Rite Aid's electronic communication system.

May 4, 2009, during which Boyle told Ekhato that she "may not be the right fit for the district." *Id.* at 2. Ekhato "answered, maybe not." *Id.* After this call, Ekhato talked to David Mahan, the regional vice president and manager of the front end of the pharmacies in Ekhato's district, who calmed her down. She met with Mahan and Mark Firment the next day. *Id.*

Ekhato summarized her concerns with Boyle as his "inability to discuss business matter[s] without yelling," his "unwillingness or impatience to listen to my response after he has had his say; he hangs up when he is done," and "[f]requent phone calls very early in the morning, throughout the day, and into the evening." *Id.* This is the only complaint to Rite Aid management made by Ekhato. Ekhato does not indicate what, if any, follow-up occurred as the result of this report to Grenier. However, Ekhato testified at her deposition that she continued to have a working relationship with Boyle and there were no problems between them in the following months. *Plt.'s Ans.,* Exh. B, *Ekhato Dep.* at 257. She also testified that her staffing issues were resolved by October, 2008. *Id.* at 248.

Grenier testified that, after meeting with Ekhato, she spoke separately with Boyle about this complaint. *Plt.'s Ans.*, Exh. F, *Grenier Dep.* at 42. Grenier also discussed this situation with Firment and Mahan. *Id.* at 46. Neither had ever heard Boyle yelling at Ekhato but they told Grenier that Boyle normally speaks in a loud voice. *Id.* at 54-55. In addition, Grenier testified that she had not received any complaints from other employees about Boyle.[10] *Id.* at 38, 75. Based on these conversations, Grenier determined the problem to stem from a lack of communication concerning Rite Aid's pharmacy staffing formulas and the responsibilities of a PDM. *Id.* at 44; 48-49; 60-65.

---

[10] I note that Rite Aid employees represent a wide range races, ethnicities, and ages.

She recommended that Firment and Mahan provide communications counseling as needed and act as intermediaries if problems arose in the future. *Id.* at 48. Grenier instructed Ekhato to come to her if there were any additional problems and reminded her that the company had a "zero retaliation policy." *Id.* at 49-50. She assumed the matter was resolved because she never received any additional complaints. *Id.* At no time did Ekhato say that she felt she was being discriminated against by Rite Aid in any manner. *Id.* 72. In fact, Ekhato acknowledges she made no complaints of discrimination and never felt discriminated against while employed at Rite Aid. *Plt.'s Ans.,* Exh. B, *Ekhato Dep.* at 18, 335.

Rite Aid has provided documents that were prepared by Boyle as part of his purported efforts to improve Ekhato's performance. The first, dated May 8, 2008, was intended to notify Ekhato that her "performance was not meeting company expectations." *See Def. Mot.,* Exh. P. Boyle's handwritten note indicates this document was discussed with her on May 12, 2008. It was not signed by Ekhato and she does not recall meeting with Boyle to discuss her performance.[11] Boyle described four areas that needed immediate improvement: prepping stores for inventory day; keeping stores clutter free; keeping payroll consistent with procedures and budget allotted; and maintaining customer satisfaction at a minimum of 75 percent. Ekhato was also told to "address [her] communication skills, both written and oral. Your team needs to

---

[11] Although she denies physically "meeting" with Boyle to discuss her performance in May, 2008, Ekhato is less certain about whether he ever discussed these points with her. *Ekhato Dep.* at 234-37. Boyle states that he met with her on May 12, 2008, and had intended to give her the letter summarizing her performance issues but "decided to handle the matter as a verbal warning." *Def.'s Mot.* Exh. D, *Boyle Aff.* ¶17. In any event, Ekhato asserts that this document was drafted in response to her complaints about Boyle's conduct to Firment and Mahan on May 5, 2008. *See Plt.'s Ans.* at 17. Grenier did not talk to Boyle about this complaint until after she met with Ekhato later in May, so Ekhato "presumes" Mahan told Boyle of her complaint and that Boyle prepared this memorandum in response. *Id.* Ekhato presents no evidence to support her presumption and Mahan does not recall ever discussing Ekhato's complaint with Boyle. *Plt.'s Ans.,* Exh. K, *Mahan Dep.* at 85.

receive direction from you in order to perform their best work." *Id.*

On August 1, 2008, Boyle and James Ivers, a human resources manager for Rite Aid, met with Ekhato to discuss her performance. This meeting was also memorialized in a document prepared by Boyle and the concerns are consistent with those set forth in Boyle's May memorandum. *See Def. Mot.,* Exh. Q; *Plt.*'s *Ans.*, Exh. 80. Again, the document was not signed by Boyle or Ekhato but includes a similar hand-written notation that Boyle had discussed the memorandum with Ekhato.

This document describes Boyle's concerns in "the following key areas:"

- Customer satisfaction: we need to make sure your pharmacists are practicing ready when promised at all times, in addition proper workflow procedures need to be implemented and adhered to.
- Building sales: schedules need to be stabilized and associates need to be engaged in promotions both in and out of store.
- Clutter free: associates need to be held accountable for maintaining a neat and clean work environment. Keep in mind a clean lab is a state board requirement. Food should be eaten in the break room and not in the dispensing area.
- Execution on company programs: acrylic displays need to be properly set and store staff needs to be aware of and participating in all current marketing initiatives (ie patient callback program, living more, etc.)
- Protecting the bottom line (pharmacy controllable ebitda):[12] this can be achieved thru expense control (managing payroll to plan and earned hours, reduction of audit chargebacks, supply management and controlling pharmacy inventory shrink thru proper inventory preparation).
- Adherence to raptar[13] culture when visiting stores. There have recently been two complaints to the union from associates in stores 872 and 3394.

*Id.* at 2.

In his deposition, Ivers described this meeting with Ekhato as an intended counseling or

---

[12] "EBITDA" is a Rite Aid term that refers to earnings before interest, taxes, depreciation and amortization.

[13] "RAPTAR" refers to a Rite Aid company policy to encourage positive working relationships and stands for Recognition, Appreciation, and Praise/Treat Associates Respectfully.

coaching session designed to help her improve her communication skills.  *Plt.'s Ans*., Exh. H, *Ivers Dep.* at 44-45.  Ivers testified that his focus in this session was to address two complaints he had received from a union representative who had called him and said "you got this woman that's acting like a crazy person at the store, she is scaring the associates."  *Id.*  According to Ivers, the meeting with Ekhato did not go well – he described it as "more or less a combative meeting . . . she didn't want to hear it." *Id.*  Ekhato acknowledges that this meeting occurred and that the above items were discussed with her.  *Plt.'s Ans.,* Exh. B, *Ekhato Dep.* at 259.

On August 12, 2008, Boyle conducted a telephone conference with all of his PDMs to discuss an upcoming trade show.  He told the PDMs that they could bring a pharmacist to the conference if each of their stores had sufficient coverage in the pharmacies.  A company-wide deadline was set in order to make travel and hotel accommodations.  Ekhato was unable to bring a pharmacist because her shifts were not covered by the deadline.

Personality issues were further exposed at the trade show.  Ekhato shared a room with another PDM, Cynthia Chang.  Ekhato describes this pairing as "not good."  *Plt.'s Ans.* at 25.  Ekhato attributes this to the fact that she is a devout Christian and Chang would not pray with her. *Id.*  Ekhato acknowledges that the two of them got into an argument "in a hallway of the convention center hosting the Trade Show." *Id.*   Her complaint is that when Boyle intervened he "naturally took Ms. Chang's side, assuming Dr. Ekhato was the instigator." *Id.*  She cites Boyle's deposition testimony to support this conclusion, but a fair reading of the testimony is that he was describing a couple of "pretty ugly instances" – a hallway conversation with a shaken pharmacist, Alan Katz, after what Katz described as an altercation with Ekhato, and then entering the meeting room and having to separate Ekhato from fellow PDMs Chang and Christine

8

Caravello for fear she might assault them.  *Id.*

Although the recollections of the attending employees vary to some degree in the details, all but Ekhato attribute the core of the problem at the trade show to Ekhato's inability to bring one of her pharmacists to the conference.  Ekhato had invited a pharmacist believing her stores had been fully staffed.  Just before the conference, Ekhato learned that was not the case.  According to several Rite Aid employees, including Boyle, this caused Ekhato to get into an argument with Boyle at the trade show.  Boyle testified that Ekhato was upset that she was unable to bring a pharmacist and she yelled at him, "exhibit[ing] unprofessional and embarrassing behavior in front of numerous Rite Aid employees."  *Def. Mot.,* Exh. D, *Boyle Aff.* ¶ 22.  This conduct was witnessed by Chang and Caravello.  *Id.*, Exh. H, *Chang Aff.* ¶ 17; Exh. L, *Caravello Aff.* ¶ 14.  Chang also describes another instance where Ekhato yelled at Chang in front of co-workers because she had told them that Ekhato was not going to join them for breakfast that morning.  *Id., Chang Aff.* ¶ 18.  Ekhato denies complaining to or yelling at Boyle at the trade show.  *Ekhato Dep.* at 265-66.

The problems continued when the group returned to work following the trade show.  Ekhato admits she and Chang had a "heated phone call about the Trade Show" on August 21, 2008.  *Plt.'s Ans.* at 26.  Without any citation to the record she contends "Boyle *presumed* Dr. Ekhato was at fault, although he did not speak to Dr. Ekhato to hear her side of what happened during the phone call."  *Id.* [emphasis added].  She further asserts, again without reference to the record, that Boyle "apparently solicited written statements" from Chang and Caravello and forwarded Caravello's e-mail to "corporate headquarters giving it the imprimatur of truth."  *Id.* She then boldly concludes "Boyle would never have taken similar action against a white, Asian

or non-African born employee, but for him there was no reason to ask a black Nigerian-Born employee what happened, because they are not trustworthy." *Id.* Alas, no citation to any fact in record to support such a conclusion.

These allegedly suspect written statements are e-mails and are exhibits in the record. There is no indication that they were "solicited" by Boyle. One is an e-mail from Chang to Dave Mahan dated August 22, 2008. Chang describes Ekhato's screaming at the trade show and her later call after the trade show to continue the same discussion. Chang states that Ekhato was so loud and rude on the phone that she had Caravello and co-worker Sean Simmons listen to the call. After Ekhato hung up, Caravello and Simmons encouraged Chang to report the call. *Plt.'s Ans.*, Exh. 97. Caravello brought the incident to the attention of Boyle – who was out of the office when the incident occurred – in an e-mail also dated August 22, 2008. *Id.*, Exh. 99. Caravello details the telephone conversation and the problems at the trade show – corroborating Chang's complaint. She also describes her own problem with Ekhato that occurred in June 2008.

> [Ekhato] verbally attacked me in front of John Boyle and Hao Tran and claimed that I was a liar. She would not listen to anything I was saying and continued to yell at me for no valid reason. This was also embarrassing, especially due to the fact that our newly graduated interns were sitting on the other side of the wall and they most likely heard the yelling.

*Id.* at 2.

Boyle forwarded Caravello's e-mail to Phil Keough, the Senior Vice President of Pharmacy Operations. Keogh responded that Ekhato's behavior was not acceptable or tolerable and told Boyle to get human resources involved. *Id.* at 1. Boyle planned to write-up Ekhato but, because of a death in her family, he decided not to go forward with it at that time. *Def. Mot.,*

10

Exh. D, *Boyle Aff.* ¶ 24.

During the summer of 2008, Rite Aid's Internal Assurance Department had begun an investigation of suspicious Consumer Satisfaction Index ("CSI") phone activity at one of Ekhato's stores.  The activity involved Rite Aid employees in Ekhato's district calling the CSI phone number in an effort to improve the customer satisfaction ratings.  Higher ratings resulted in larger employee bonuses.  All employees knew they were not permitted to make these calls.

Loss Prevention Manager Richard Wozniak was originally assigned to the investigation. He reviewed a surveillance video from the store that revealed a pharmacy technician, Naly Moua, was retaining customer receipts.  *Def. Mot.,* Exh. O, *Wozniak Aff.* ¶¶ 7-8.  In her interview with Wozniak, Moua told him she had called the CSI survey number at the instruction of her pharmacy manager, Andrea Marinaro.  *Id.*, at ¶ 8.  Marinaro told Wozniak that Ekhato had instructed her pharmacy managers to "do whatever it takes" to improve the district's CSI scores. *Id.*, at ¶ 9.[14]  This statement was independently confirmed by another pharmacist, Shaji Joseph. *Plt.'s Ans.*, Exh. I, at 56.  Once Wozniak's investigation implicated Ekhato, a management level employee, the investigation was turned over to his supervisor, Dustin Hudgins, a Regional Loss Prevention Manager.  *Id.*, at ¶ 10.

On October 9, 2008, Hudgins reported his initial findings to Ivers, Firment, and Boyle. *Def. Mot.*, Exhibit J, *Hudgins Aff.* ¶ 18; *Boyle Aff.* ¶ 30.  Hudgins had interviewed seven employees and four had stated that Ekhato gave a directive to improve their scores and they

---

[14] Marinaro testified that during a meeting with Ekhato and approximately 30 other employees under Ekhato's supervision, Ekhato asked the group why the CSI scores for their district were so low.  She said a pharmacist responded that other pharmacists were having friends call and were calling the line themselves. According to Marinaro, Ekhato's response was "well, I guess that's what we have to do, too."  *Plt.'s Ans.*, Exhibit L, *Marinaro Dep.* at 29.

interpreted that to mean make the CSI calls. *Hudgins Aff.* ¶ 17. This is the first time Boyle was told of the investigation and Ekhato's involvement. *Boyle Dep.* at 176; *Hudgins Dep.* at 57-59, 61-62.

The same day, Ivers called Ekhato into the regional office for an interview based on the results of Hudgins' investigation. *Def. Mot.*, Exh. F, *Ivers Aff.* ¶¶ 7-9. Ivers, Hudgins, Firment and Boyle all describe Ekhato's behavior at the meeting as defensive and evasive. Ekhato denies being defensive or evasive but testified that she was very angry about what she considered an attack on her character and she accused Hudgins of lying. *Plt.'s Ans.*, Exh. B, *Ekhato Dep.* at 302-305. Ekhato was so angry that the management team left the room. *Id.* at 307. When they returned Ekhato was told she was suspended with pay. *Id.*

Prior to this interview with Ekhato, there had been no discussions concerning potential disciplinary action. *Plt.'s Ans.*, Exh. E, *Firment Dep.* at 149. In the days that followed, Rite Aid management, including Senior Vice President of Human Resources, Kristin Crandall, discussed how to handle this situation. Although demotion to pharmacist was considered, it was ultimately determined that it was best to terminate Ekhato. *Plt.'s Ans.,* Exh. E, *Firment Dep.* at 134-39.

On October 14, 2008, Ivers, Firment, and Boyle met with Ekhato. Boyle informed Ekhato that she was being terminated for the following reasons, listed in what Boyle called his "talking points."[15]

- The decision had been made to terminate your employment.
- This decision is based on several instances of performance issues
    - 8/01/08 meeting where we discussed performance
    - Disrespectful behavior towards your colleagues at the Trade Show

---

[15] Boyle testified that this document was prepared by Firment and was based on a conversation with Boyle, Firment, Ivers, and Crandall. *Plt.'s Ans.,* Exh. A, *Boyle Dep.* at 155

       o     Concerns that have been brought to our attention via union grievances
       o     Disrespectful treatment towards DMA[16]
       o     Poor follow-up with cx complaint issues on Pharmacist Nichelle
       o     Poor communication of the proper implementation of CSI program

Overall, this decision has been based on
- Your lack of leadership
- Poor communication
- Creating an environment where others have made poor decisions

*Plt.'s Ans.,* Exh.153; *Def. Mot.* Exh, D.  This lawsuit followed.

## II.  STANDARD OF REVIEW

The standard for summary judgment is well established.  I must consider the evidence in a light most favorable to the non-moving party.  If there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

However, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion.  Here, Ekhato must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  She "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1992).  She cannot "merely rely upon conclusory allegations in her pleadings or in memoranda and briefs." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

---

[16] DMA refers to the position of district manager's assistant.  This bullet point is a reference to Ekhato's relationship with her DMA, Tanya Dunston-Pursell.

## III.  DISCUSSION

A.  A *Prima Facie* Case of Discrimination

Ekhato brings claims of discrimination under Title VII of the Civil Rights Act of 1964, 42

U.S.C.A. § 2000e, *et seq*., and the parallel grounds for liability in § 1981 of the Civil Rights Act,

the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq*., and the

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 955(a) and (e).  Title VII and the

ADEA prohibit an employer from discriminating against an individual based on race, color,

religion, sex, or national origin.  Ekhato asserts her claims under these statutes against Rite Aid.

The PHRA provides broader discrimination protection by including the acts of  "any person,

employer, employment agency, labor organization or employee."  Ekhato asserts her claims

against Boyle under the PHRA.

To prevail in an employment discrimination case under each of these statutes, Ekhato

must first come forward with enough evidence to establish a *prima facie* case of discrimination

against Rite Aid.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Anderson v.

Wachovia Mort. Corp*., 621 F.3d 261, 267-68 (3d Cir. 2010) (applying *McDonnell Douglas*

framework to a claim of discrimination under §1981); *Scheidemantle v. Slippery Rock Univ.

State*, 470 F.3d 535, 539 (3d Cir. 2006) (applying *McDonnell Douglas* framework to a claim of

discrimination under the PHRA); *Smith v, City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009)

(applying *McDonnell Douglas* framework to a claim under the ADEA).

To establish a *prima facie* case of discrimination, Ekhato must show that: (1) she is a

member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse

employment action; and (4) similarly situated individuals not of the protected class received

more favorable treatment or the circumstances of the adverse employment action otherwise give rise to an inference of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802. Ekhato is only required to produce evidence sufficient to create an inference that an employment decision was based upon an illegal discriminatory criterion. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356-57 (3d Cir. 1999).

The defendants conceded at oral argument that, for purposes of this motion, Ekhato has established a *prima facie* case of discrimination, and thus, the burden shifts to Rite Aid to offer a legitimate, non-discriminatory reason for its actions. *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006). The parties further agree that the talking points used by Boyle at the time of Ekhato's termination are non-discriminatory reasons that would justify Rite Aid's action and therefore the issue before me is whether the evidence Ekhato has offered to rebut those reasons precludes summary judgment.

To defeat Rite Aid's motion, Ekhato must provide sufficient evidence from which a fact-finder could reasonably infer that Rite Aid's reasons were either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations, emphasis and footnotes omitted). In other words, Ekhato must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendants' proffered legitimate reasons for her termination that a reasonable fact finder could rationally find them 'unworthy of credence' and, hence, infer that the defendants did not act for asserted non-discriminatory reasons." *Gosnell v. Runyun*, 926 F. Supp. 493, 497 (M.D. Pa. 1995) (citing *Fuentes*, 32 F.3d at 765).

15

B.  Evidence of pretext

     Ekhato does not offer any direct evidence of discrimination to establish pretext.  There

were no words spoken or actions taken that implicate an obvious animus based on race, national

origin or age.  Thus, to meet her burden, Ekhato points to a variety of business decisions she

perceives to be discriminatory that center on her assertion that Boyle was biased against her.  She

contends this bias was the reason she was fired, and from that, the fact-finder can infer that the

reasons offered for her termination were a pretext.

     Specifically, she contends Boyle: 1) assigned her "the hardest district to manage within

his region;" 2) "deprive[d] her of a sufficient number of full-time pharmacists;" and 3) assigned

her "the weakest District Manager's Assistant ("DMA") in the region."  *Plt.'s Ans.* at 18.

Although not said in so many words, it appears her assertion is that Boyle took these actions

because of his racial, ethnic, and age animus.  Essentially, Ekhato contends that Boyle set out to

make her fail when he promoted her by giving her a difficult district, limiting her resources, and

assigning her poor support staff.  In support of these assertions, Ekhato repeatedly relies on

subjective assumptions without any citation to evidence in the record or on instances where she

simply disagrees with the policies or decisions of Rite Aid management.

     First, Ekhato argues that her promotion to District 7203 is evidence of Boyle's

discriminatory animus.  I am certain that no reasonable fact-finder would agree.  This claim, like

Jack's beanstalk, has grown during the course of this litigation.  Before the EEOC, Ekhato

claimed she applied for the position of PDM for District 7203 when she saw the opening on an

intra-office job posting.  At her deposition, she testified she did not know what district she was

applying for – only that it was one under Boyle's supervision.  Now, she contends that two

16

positions were available when she applied and, as a result of bias on Boyle's part, she was given

the less desirable district – one that Boyle waited to fill until a "suitable black applicant" applied.

But how does failing to fill a difficult job with an unqualified candidate, black or white,

American or non-American, young or old, and instead filling it with a qualified candidate,

regardless of her demographic identity, evidence discrimination against the person who was

hired?  It is certain no fact-finder would determine that Ekhato became the victim of

discrimination because she was promoted and someone else was not – especially when she

claims superior credentials.  Arguing that the very person who interviewed and then promoted

you to the very position you applied for bears a discriminatory animus against you is a difficult

charge to sustain – particularly when he did not  know you or encourage you to apply for the

position or have any past relationship with you that might motivate his discriminatory conduct.

Thus, the claim becomes that you were given a difficult job when an easier one – for which you

did not apply – was available.  But even then, how does deciding you are the right candidate for a

difficult job evidence discrimination, particularly when you assert you have credentials that are

superior to other PDMs?  This argument is also inconsistent with the fact that some of the

objective measures of Ekhato's performance, i.e. improvement of the financial performance of

her district and her ability to ultimately resolve her staffing issues, showed she had the potential

to succeed in this district.

Further, Ekhato has not presented evidence that the district to which she was assigned

(District 7203) was worse than the other district she contends was also available (District 7207).

She merely states her district "contained many inner-city stores," and thus, the fact-finder should

infer poor quality.  As proof that Boyle waited to fill the PDM position until a black candidate

applied she cites a Rite Aid document dated July 27, 2007, that shows the PDM position for District 7203 was vacant and that it was the lowest ranked district in Boyle's region. *Plt.'s Ans.*, Exh. 8.[17]  Rite Aid denies that two positions were available at the time Ekhato applied and asserts that the position she now claims should have been hers did not exist until the region was restructured following the creation of the Philadelphia Project.[18]  This position is supported by the exhibits offered by Ekhato.

Plaintiff's Exhibit 42 is a Rite Aid document for fiscal year 2009 that shows the dates employees were promoted or received pay raises. *Plt.'s Ans.*, Exh. 42, at 2.  This document shows Dain Rusk was a new hire for PDM on October 8, 2007, and Christine Caravello was promoted to PDM on November 4, 2007. *Id.*  Ekhato does not contend that she applied for either of these positions.  On December 23, 2007, Ekhato was the next person promoted to a PDM position. *Id.*  Michael Truong was promoted on February 10, 2008. *Id.*

Plaintiff's Exhibit 175 reveals that at the beginning of fiscal year 2008, Region 72 had nine districts with no PDM openings and Igdaliah Jackson was the PDM for District 7203. *Plt.'s Ans.*, Exh. 42, at 2.  A December 17, 2007 report titled "Philly Project Breakdown FY08" shows that the region added District 7210 with the creation of the Philadelphia Project, but Angela Ekhato was already slotted for PDM in District 7203. *Id.* at 1.  This is the first document that shows a PDM vacancy in District 7207, but it also shows that Ekhato was already slotted in District 7203.  These documents show that District 7207 became available with the creation of

_____

[17] This exhibit is the "Pharmacy Scorecard Rankings by District YTD" for the week ending July 28, 2007. District 7201 had the lowest ranking of the pharmacies in Region 72 (Boyle's region), and did not have a PDM assigned to it.

[18] Rite Aid created the Philadelphia Project by joining the lowest performing pharmacies into a smaller district in an effort to increase their profitability.

18

the Philadelphia Project and only after Ekhato had already been promoted to District 7203.[19]

Thus, two PDM positions were filled before Ekhato applied, she got the position that was

available when she applied, and the new position she now claims she should have had was not

created until after her promotion.  *Plt.'s Ans*. Exhs. 8; 42; 175.

 Next, Ekhato claims she was not given sufficient resources.  This claim is also not

supported in the record, nor is there evidence that her perceived lack of resources is motivated by

discriminatory animus.  It is clear there was a disagreement about the number of pharmacists

Ekhato wanted and the number Boyle determined she was entitled to hire.  But this dispute

concerned a company staffing policy, not a discretionary decision by Boyle and there is no

evidence that this policy was applied differently to other similarly situated PDMs.  In fact, this

dispute was handled by the human resources department as soon as it was notified of the

problem, Ekhato resolved her personnel issues, and she testified that she had no further problems

with Boyle.

 Finally, Ekhato offers no support for her claim the assignment of DMA Dunsten-Pursell

as her assistant was motivated by discriminatory animus.  Ekhato describes Dunstan-Pursell as

"an ineffectual DMA," but she does not cite to any record of her complaining about Dunstan-

Pursell's work.  Ekhato cites one performance evaluation compiled on April, 2008 to support her

characterization of Dunstan-Pursell's abilities.  *Plt.'s Ans.,* Exh. 42.  This report shows Dunstan-

Pursell was the only DMA with a performance rating of "needs improvement."  Ekhato claims

---

[19]  The same document that Ekhato uses to establish her district was the worst performing district shows that
the district she now claims she should have been assigned, District 7207, was the third worst performing district.
*Plt.'s Ans.*, Exh. 8.  Of course, the make-up of the districts changed with the creation of the Philadelphia Project and
with the corporate redistricting that occurred for the next fiscal year.

Boyle and Chang found Dunstan-Purcell ineffective based on the "belief" of Mark Firment *Plt.'s Ans.* 19.  She does not cite any testimony from the depositions of either Boyle or Chang that would support this assertion.  Again, she contends Caravello asked for another DMA without citation to the record.  When was Dunstan-Pursell Caravello's DMA?  What did Caravello say about her competence?  How does Ekhato know what Caravello thought about Dunstan-Pursell?  Simply put, Ekhato's subjective belief is not sufficient to establish that Dunstan-Pursell was ineffectual.

Ekhato also attempts to link pre-existing circumstances to some sort of bias on the part of Boyle.  The facts reveal that Dunstan-Purcell was the DMA for District 7203 before Ekhato applied for the PDM position.  Now in hindsight, Ekhato attempts to shift blame for the failings that resulted in her discharge to her assistant when she points to no record of such concerns when she was working with Dunstan-Pursell.  This is also in contrast to Ekhato's deposition testimony that her problems with Chang at the trade show were because Chang was critical of Dunstan-Pursell without justification and their telephone argument was the result of Ekhato's attempt to explain to Chang why she was wrong.  *Plt.'s Ans.*, Exh. B, *Ekhato Dep.* at 266-71.

I have reviewed the record and find that no reasonable fact-finder could conclude that the complained of actions by Boyle were discriminatory or provide support for Ekhato's claim that the reasons for her termination were a pretext for discrimination.

C.  Rite Aid's rationale for termination is not a pretext

The only evidence of discriminatory animus is Ekhato's post-termination, subjective view of her work environment, and that view is without any direct or circumstantial evidence from which a reasonable finder of fact could conclude that Rite Aid or Boyle acted with such animus.

In each of these circumstances, the disputed facts relate to business decisions or relationships that may have resulted in some difficulty, arguments, or dissatisfaction with her employer – but lend no support to her claim of pretext.  These assertions, even if proven, are not evidence of discrimination and do not establish that the reasons for termination are pretextual.

As set forth above, Rite Aid's decision to terminate Ekhato's employment was primarily based on her lack of communication skills and leadership abilities.  These deficits are evidenced in a variety of ways – arguments with co-workers in public places, complaints from subordinates as reported by union representatives, and her reaction to questioning in connection with the CSI investigation.  Rite Aid has also provided documents and testimony in support of its assertion that this decision was reached based on Ekhato performance as a manager and that efforts had been made to counsel her in areas deemed deficient.

Pretext is not shown by evidence that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Kautz v. Met-Pro*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765).  This is a fact-based inquiry that requires examination of each of the proffered reasons for Ekhato's discharge.  *Id.* at 468.  "Evidence that the method of evaluation an employer used was not the best method does not amount to evidence that the method was so implausible, inconsistent, incoherent or contradictory that is must be a pretext for something else." *Id.* at 471.  Nor can discrimination be established by "mere speculation, intuition, or guessing." *Id.*  Thus, I shall review each reason independently and in combination.

1. 8/1/08 Meeting

Ekhato does not deny this meeting occurred and she agrees that the items listed in Boyle's memorandum reflect the topics discussed.  Ekhato claims she was singled out for criticism that was not warranted based on the fiscal performance of her district.  First, I note that this was not an adverse employment action because Ekhato's status was not diminished in any way.  Instead, this was a counseling session designed to help Ekhato succeed in a new position that was very demanding.  Boyle and Ivers discussed a variety of issues with her that were reasonably designed to achieve that goal.  There is nothing in this document or in the testimony concerning the session that evidences bias of any sort.  Moreover, despite Ekhato's assertions to the contrary, this meeting covered more than the financial performance of her stores.  Ekhato's disagreement with the non-discriminatory recommendations of her supervisor is not evidence of pretext.

Ekhato has not offered evidence that the consideration of the circumstances of the August 1, 2008 meeting in the decision to terminate her was either a *post hoc* fabrication or otherwise did not actually motivate the employment action.

2. Disrespectful Behavior at Trade Show

Ekhato acknowledges that she "got in an argument [with Chang] in a hallway at the convention center hosting the Trade Show."  *Plt.'s Ans.* at 25.  She does not deny "she had a heated phone call" with Chang after the event.  *Id.* at 26.  She simply contends Boyle sided with Chang and assumed Ekhato was the instigator of the argument even though he had no specific knowledge about how it started.  *Id.* at 25.  She claims she "tried to explain the situation and that it was not her intention to get into an argument, but Mr. Boyle would not listen."  *Id.* at 26. Accepting this as true, this is not evidence of animus.  Boyle did not need to know how the

22

argument started in order to decide that he should address the issue with Ekhato because management received complaints about Ekhato's behavior from Chang and Caravello, he personally observed Ekhato's behavior, and it was Ekhato's behavior that was unacceptable. A reasonable finder of fact would have to conclude that Ekhato's admitted conduct alone, with or without her explanations, would justify discharge in most workplaces. Moreover, Title VII is not a mechanism for settling work-place arguments or bad behavior that is not related to any discriminatory animus. There is no allegation that the arguments about the Trade Show were the result of the discriminatory conduct or intent of Chang or Caravello.[20]

Ekhato has not offered evidence that consideration of her behavior with co-workers in the decision to terminate her was either a *post hoc* fabrication or otherwise did not actually motivate the employment action.

---

[20] In a sur-reply brief filed the day before oral argument, Ekhato raised a "Cats Paw" theory to establish discriminatory motivation on the part of the defendants. Under this theory, an employer may be liable for a supervisor's discriminatory conduct that results in the termination of an employee, even though that supervisor did not make the decision to terminate, if the decision maker's actions were based on the wrongful acts of the supervisor. *Staub v. Proctor Hosp.*, __ U.S. __, 131 S. Ct. 1186 (2011).

Ekhato asserts that the decision to terminate her was based in part on inaccurate complaints of Cynthia Chang and that those complaints "were animated by Ms. Chang's discriminatory animus against blacks and people from African nations." *Plt.'s Sur-Reply* at 1. This claim is without merit.

First, Ekhato ignores the fact that Chang was not Ekhato's supervisor. Second, there is no evidence that Chang bore a discriminatory animus against Ekhato. Ekhato relies on Chang's deposition testimony to demonstrate her discriminatory intent. In so doing, she contends Chang's testimony to be "about the slow brain processing, communication skills, and intelligence of two of the four black PDMs who have worked under Mr. Boyle." *Id.* at 4. In fact, the testimony cited indicates Chang denied Ekhato was "a slow mental processor" when asked that question by counsel for Ekhato. *Id.* at 5. Chang said "she was just a slow worker." *Id.* at 6. When asked to compare Ekhato's intelligence with other PDMs she responded, "I don't compare people about their intelligence, so – I just noticed she was not a quick learner." *Id.* When asked to name another PDM who was not a quick learner, she named another African-American. No reasonable finder of fact could conclude that this testimony supports Ekhato's claim of bias. Even so, Chang was not the lone witness to testify concerning the incidents at the trade show or the later phone call and there has been no assertion that the other employee witnesses held any discriminatory animus towards Ekhato.

3.  <u>Union Grievances</u>

Ekhato also cites the fact that Boyle erroneously believed a union grievance had been filed to show his prejudice against her.  Boyle's misunderstanding about the form of the union complaint does not change the fact that two employees had registered complaints with their union representative about Ekhato.  At her deposition, she acknowledged that complaints were made and explained that the complaints were really about Rite Aid policies that she was simply enforcing.  Nevertheless, complaints were made about her conduct by those she supervised. Boyle and Ivers addressed their concerns about Rite Aid's RAPTAR policy with Ekhato in response to those complaints.  Discussing management style with a newly promoted PDM in an effort improve her performance is not evidence of discriminatory intent.

Ekhato dismisses the reported complaints of union employees because, contrary to Boyle's belief, there was no formal grievance filed.  However, the testimony is clear.  Ivers got a phone call as a "heads up" that Ekhato was a management problem, and she was advised of the complaints at the August 2008 counseling session.  Her reaction to this meeting was consistent with her conduct throughout her employment – when challenged or criticized she got angry. Although she was angry at the meeting with Boyle and Ivers, and apparently felt their criticism was unfounded, she did not complain that she was being treated differently because of her race, national origin, or age.  She did not even go back to Greiner to complain that Boyle was still yelling at her, despite having been instructed to do so if problems between them persisted.

Ekhato has not offered evidence that consideration of subordinate employees complaints in the decision to terminate her was either a *post hoc* fabrication or otherwise did not actually motivate the employment action.

4.  <u>Disrespectful Treatment of DMA</u>

Ekhato does not directly refute this talking point, but asserts it is "makeweight."  *Plt.'s*

*Ans.* at 43.  Her response is limited to the following:

> Ms. Dunstan-Pursell is a white, native-born American, and Dr.
> Ekhato apparently was not entitled to criticize her when she
> performed poorly, for example by having difficulty scheduling the
> pharmacists.  Apparently, a black, African-born manager was not
> entitled to demand excellence of her white, native-born
> subordinates.  Certainly the management team in Region 70 had
> never previously counseled Dr. Ekhato that she was treating Ms.
> Dunstan-Pursell improperly, and there is nothing in the file that
> criticizes Dr. Ekhato with regard to her treatment of Ms. Dunstan-
> Pursell before October 9, 2008.

*Id.*  This self-serving statement, without any assertions of fact or citation to the record from

which a fact-finder might infer discriminatory intent, is not evidence of pretext.

5.  <u>Poor Follow-Up on Pharmacist Complaints</u>

Again, there is little in the record or briefs addressing this talking point.  Ekhato describes

this as "another bogus charge."  *Id.*  This issue concerned the dismissal of pharmacist Nichelle

Clingscale.  According to Ekhato, Clingscale worked in her district, "was frequently unhelpful or

rude to customers," and that resulted in "a series of customer complaints."  *Id.*  "Ekhato was in

the process of documenting Ms. Clingscale's faults justifying termination of her emploment at

the time Dr. Ekhato was fired . . ."  *Id.* at 44.  She challenges Rite Aid's determination that her

actions in this regard constituted poor follow-up and she notes Boyle testified that she "was

responding to customer complaints and was trying to manage Ms. Clingscale."  *Id.* (citing *Plt.'s*

*Ans.*, Exh. A, *Boyle Dep.* at 175).  But this citation to the record is incomplete and misleading.

Boyle testified that Ekhato was not properly managing Clingscale and that was evidenced by the

25

fact that he was getting repeated complaints.  *Id.* at 173.  He went on to state:  "If you have the neighborhood committee calling me and saying they are going to boycott the store and make sure the television stations are aware, that's a pretty severe breakdown in customer service."  *Id.*

Again, Ekhato fails to offer evidence that this was anything more than a disagreement with a supervisor's view of her performance.  She points to no evidence from which a fact-finder could infer pretext.

　　　6.  Poor Communication of Proper Implementation of CSI Program

Ekhato reviews the CSI investigation with a close eye and points to a number of inconsistencies in the statements of the various employees involved.  There is a question as to whether the comments attributed to Ekhato occurred during an in-person meeting or a telephone conference.  There are differing recollections as to who was present and exactly what was said. But the bottom line is the same, the improper calls were made by employees who worked for Ekhato in an effort to improve the district's CSI scores.  Ekhato does not deny discussing this issue with her staff and her desire to improve her district scores.  In fact, Rite Aid did not conclude that she directed her employees to make the calls, only that Ekhato's communication and leadership skills were lacking and may have led these employees to believe this was what she wanted.  That conclusion is supported by the investigation results and acknowledges the inconsistencies in the statements and recollections of those interviewed.

The effect of the investigation on Ekhato's termination is also viewed differently by the parties.  Ekhato asserts the investigation was "defective and rigged," and her "statement's were

dismissed out of hand in favor of those of a white, native-born employee."[21]  *Plt.'s Ans.* at 26.

Ekhato also asserts that she was treated differently because she was the only one fired and she

had not made any of the calls.  In the end, the investigation was not the cause of Ekhato's

termination, it was her reaction to being questioned in connection with the investigation, in

addition to other deficiencies that had been discussed with her on prior occasions, that resulted in

her being dismissed.

The investigation was independent of any problems she may have had with Boyle or her

co-workers.  Boyle had no knowledge of the fraud investigation and was not involved with the

investigation until the day Ekhato was interviewed.  Yet, Ekhato insists Boyle's discriminatory

motives led to this investigation.

7.  Ekhato's overall performance

As set forth above, Ekhato's offer of evidence to establish pretext is lacking.  *See Ezold v.*

*Wolf Block*, 983 F.2d 509, 527 (3d Cir. 1992) (without some evidence to cast doubt on the

employer's stated reason, the court will not interfere in an otherwise valid management decision).

The prior talking points when considered alone or in combination support Rite Aid's

determination that Ekhato had demonstrated an overall lack of leadership skills and poor

communication skills that led to a situation where her subordinates had made bad decisions.

Considered as a whole, I find that Ekhato has not demonstrated such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in Rite Aid's reasons for her

termination that would permit a reasonable fact-finder to determine that the reasons were

---

[21] It is not clear who this refers to – one of the investigators, Richard Wozniak or Dustin Hudgins; one of the management group that conducted the interview; or one of the employees interviewed.

unworthy of credence, and thus, infer that Rite Aid or Boyle did not act for the asserted non-discriminatory reasons.

D.  Retaliation Claims

In Counts III, VI, and VIII, Ekhato raises retaliation claims under Title VII, the ADEA, and the PHRA; however, she failed to respond in any way to Rite Aid's assertion that no evidence of retaliation has been established.  It was also agreed at oral argument that Ekhato was no longer pursuing this claim.  This is understandable because there is no evidence of retaliation as there is no evidence that Ekhato engaged in any protected activity.  The lack of any complaint that could in any way have put Rite Aid on notice that Ekhato believed she was being discriminated against, let alone retaliated against, is fatal to her claims, and therefore, Rite Aid's motion for summary judgment on Counts III, VI, and VIII is granted.

## V.  CONCLUSION

This case exemplifies a classic workplace problem.  An employee, proficient in her current position applies for and receives a promotion to a management position.  This new position requires different or additional skills that have not been demonstrated by the employee but the employer decides to take a chance on her.  Problems with management skills arise, mentoring is offered and efforts at counseling are made, but ultimately there is a straw that breaks the camel's back and a bad decision must be rectified.

Ekhato was a skilled pharmacist and a hard-working and dedicated employee who sought to advance to a management position.  Despite some initial uncertainty about her qualifications for the management position, Ekhato was promoted.  She went from a pharmacist responsible for one store's prescriptions to a PDM responsible for a district that included 19 pharmacies.  It was

only then that she demonstrated problems supervising employees, difficulty taking constructive criticism, a short-temper when dealing with her immediate supervisor and other PDMs.  She was defensive and incensed when interviewed concerning an internal fraud investigation.  After almost one year, it was Rite Aid's determination that Ekhato was not able to continue in the management position.  Her overreaction to the CSI investigation raised questions about returning Ekhato to her former position.

Although it is clear that Ekhato contends that the decision of Rite Aid to terminate her was an act of discrimination, and some may agree that other options were available to Rite Aid, she has failed to present evidence that her termination was motivated by anything other than legitimate business needs.  Because no reasonable finder of fact could conclude that Ekhato's termination  was based on any discriminatory animus or in retaliation for engaging in any protected activities,  defendants' motion for summary judgment is being granted.

An appropriate order follows.